[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Most lawyers provide valuable (albeit often free) advice and services to members of their families. Unfortunately, Attorney John L. Giulietti is not like most lawyers. He used his position as the family lawyer to lend credence to numerous false representations to his parents and siblings and virtually eradicated his father's simple plan to transfer his property and business equally to his four children.
This court has heard evidence in four related cases, all of which pertain to the personal and business interests of a Vernon family which for many years trusted one of its members, an attorney, John L. Giulietti, to look out for their best interests. Unfortunately, their trust was misplaced.
This decision applies in each of the following actions[1]:
 1. James Giulietti and Joanne Giulietti Hollis v. John l. Giulietti and Anita Giulietti, No. X03 CV 98 0492096S — the Partition Action;
 2. John J. Giulietti and Alma L. Giulietti v. John L. Giulietti, et al, No. X03 CV 98 049285S — the Legal Malpractice Action;[2]
 3. James D. Giulietti v. Vernon Village, Inc., No. X03 CV 98 0492099S — the Corporate Dissolution Action; and
 4. Vernon Village, Inc. v. John L. Giulietti and John J. Giulietti, No. X03 CV 98 0492124S — the Usurpation of CT Page 16188 Corporate Opportunity Action.
Facts
John L. Giulietti, an attorney and a member of the Connecticut Bar, admitted in 1972, is the eldest son of Alma Giulietti and John J. Giulietti, and the brother of James Giulietti, Joanne Giulietti Hollis, and Anita Giulietti. To avoid confusion between the attorney, John L. Giulietti, and his father, John J. Giulietti, in this opinion John L. Giulietti will be referred to as "Attorney Giulietti" and his father will be referred to as "John J. Giulietti" or "Mr. Giulietti."
John J. Giulietti never graduated from high school. He was originally a fireman and contractor in New York and came to Connecticut with his wife, Alma, and his children in the 1960's.
Attorney Giulietti practiced law in the Vernon, Connecticut area until 1979 when he closed his office. John J. Giulietti felt sorry for his son after his law practice closed, and in 1980 asked Attorney Giulietti to come and work for the family mobile home business located in Vernon. In 1981, Attorney Giulietti's younger brother, James, started working for the family business. James and his father worked in the day-to-day operations, actually running the mobile home park. Attorney Giulietti had an office in the back of a quonset hut building which served as the main office for the mobile home park. He handled all the legal matters for the family and the mobile home park business.
In December, 1983, John J. Giulietti deeded to his four children equally a 25 acre parcel of land in South Windsor. In March, 1984 he also deeded equally to his children a parcel of land located at 990 Hartford Turnpike in Vernon, sometimes referred to as the "Rockledge" Property. Attorney Giulietti prepared the deeds for those transfers.
In 1990 and for a substantial period of time before, John J. Giulietti owned 325 Kelly Road, a 32 acre parcel of land in Vernon, Connecticut. At that time John J. Giulietti and Alma Giulietti were the sole shareholders of a Connecticut corporation known as Vernon Village, Inc., which operated the mobile home park at 325 Kelly Road pursuant to an oral month-to-month lease.
During most of the time referred to herein, Joanne Hollis lived in Warwick, New York, and Anita Giulietti, sometimes also CT Page 16189 referred to as Anita Giulietti Demoupolos, lived in New Hampshire or Illinois.
In November, 1990, John J. Giulietti, James Giulietti, Attorney Giulietti and Bernard Blum, a Certified Public Accountant, met to discuss various estate planning issues including the transfer of John J. Giulietti's assets to his children. Mr. Blum suggested that Mr. Giulietti could avoid estate taxes by gifting a portion of his land and other assets to his children each year. Soon thereafter, John J. Giulietti directed Attorney Giulietti to proceed with the gifting program. That program was designed to allow Mr. Giulietti to transfer a portion of his assets to his four children each year in the maximum amount allowable without incurring any gift tax.
Attorney Giulietti prepared the first deed of an interest in 325 Kelly Road. It was a single deed in which John J. Giulietti transferred to his four children an unspecified percentage interest in 325 Kelly Road. Attorney Giulietti also prepared a document entitled "Agreement," commonly referred to throughout this litigation as the "Anti-Alienation Agreement." The Anti-Alienation Agreement prohibited, inter alia, conveyance or encumbrance of 325 Kelly Road by any owner without unanimous consent of the others until 2011, or during their father's lifetime, whichever was longer, and contemplated that any inter-owner buy-out would be at a price which was far less than the fair market value of the property. At the same time Attorney Giulietti prepared a document entitled "Terms of Escrow," hereinafter referred to as the "First Escrow." That document appointed Attorney William G. Reveley as escrow agent and provided that the aforementioned deed would be held in escrow until all the Giulietti siblings had signed the Anti-Alienation Agreement. On December 27, 1990, Attorney Giulietti advised his father to execute the deed and the "Terms of Escrow." Attorney Giulietti and his brother, James Giulietti, signed the Anti-Alienation Agreement on December 27, 1990.
On or about March 1, 1991, 325 Kelly Road was appraised by Robert Stewart for $410,000. That appraisal was based on the assumption that a long term oral, yet enforceable, lease existed between Vernon Village, Inc. and Mr. Giulietti. Therefore, the fair market value assigned to the property was far below its actual fair market value.[3] After the appraisal was completed, Attorney Reveley, acting under the direction of Attorney Giulietti, filled in the percentage conveyed by John J. Giulietti CT Page 16190 to each child by the deed as "4 7/8%."
On June 21, 1991, Joanne Giulietti Hollis and Anita Giulietti sent a written counterproposal to the Anti-Alienation Agreement to their brothers. Their counterproposal tied the term of the Agreement to their father's lifetime and gave each sibling a buy-out right at fair market value determined by appraiser(s) after January 1, 1996. Attorney Giulietti rejected that counterproposal without consultation with his father. However, he falsely represented to his sisters that their father had rejected their counterproposal.
On December 31, 1991 and December 31, 1992, respectively, John J. Giulietti signed second and third single deeds prepared by Attorney Giulietti. Each deed again transferred 4-7/8% of 325 Kelly Road to each child. On those dates Mr. Giulietti also signed a document entitled "Supplemental Terms of Escrow Agreement" (also prepared by Attorney Giulietti), which imposed the unfulfilled condition from the First Escrow upon the 1991 and 1992 gifts: the execution of the Anti-Alienation Agreement by all siblings.
Attorney Giulietti falsely represented to his siblings that his father had dictated the terms of the First Escrow and the Supplemental Escrow and that their execution of the Anti-Alienation Agreement was a condition imposed by his father. In reality the terms of the Agreement were dictated by Attorney Giulietti, apparently in order to prevent any one of his siblings from breaking up the Vernon Village business, which was Attorney Giulietti's sole livelihood.
Mr. Giulietti wanted his children to share equally in the ownership of 325 Kelly Road and to share an equal interest in the business. If one of his children worked in the mobile home business, Mr. Giulietti also wanted that child to receive a salary. However, although Mr. Giulietti surely wanted his children to work together in running the family business, he never expressed any desire 1) to prevent his children from selling the Kelly Road property for a period of 21 years, or 2) that any child who wanted or needed to sell their interest in Kelly Road to their siblings should receive only a fraction of the fair market value of the property. Those are both terms of the Anti-Alienation Agreement of which Mr. Giulietti was completely unaware and to which he never gave his consent. CT Page 16191
Attorney Giulietti takes the position that his father at least understood and approved of the basic concept of the Anti-Alienation Agreement: that it was intended by him to restrict his children's ability to sell or partition the property. There is no evidence to support that position. The court finds that Mr. Giulietti, who had difficulty reading due to failing eyesight, never read the terms of the Anti-Alienation Agreement and signed it only because his son, Attorney Giulietti, told him to. The same is true of all of the other letters and documents which were drafted by Attorney Giulietti for the signature of his father. Mr. Giulietti never read them. He signed them only because his son the lawyer told him to.
Attorney Giulietti took unconscionable advantage of the trust and confidence of his father by falsely representing to his father that the Anti-Alienation Agreement was a partnership agreement and that the Giulietti siblings legally could not
acquire any interest in 325 Kelly Road unless they signed it.
On March 11, 1993, Anita Giulietti signed the Anti-Alienation Agreement and on April 30, 1993, Joanne Giulietti Hollis signed it. Thereafter, on May 28, 1993, John J. Giulietti's first three deeds to his children and the Anti-Alienation Agreement were released from escrow and were recorded on the Vernon Land Records by Attorney William G. Reveley, acting at the direction of Attorney Giulietti.
James Giulietti, Joanne Giulietti Hollis and Anita Giulietti signed the Anti-Alienation Agreement with the understanding that their father had required that they sign it as the only condition to receiving a one quarter interest in the 325 Kelly Road property and a one quarter interest in Vernon Village, Inc. Had they known that the signing of the Agreement was a condition imposed by their brother, Attorney Giulietti, and not their father, they would not have signed the Agreement. In addition, they would not have signed the Agreement if they had known that Attorney Giulietti would require them to sign additional documents as a condition to receiving from their father their full 25% interest in the land and business.
On December 31, 1993, John J. Giulietti executed separate
deeds of 4-7/8% to each child and signed a new escrow agreement (the "Second Escrow"), this time with Attorney Giulietti and Attorney Frank McCoy, Jr. as the other parties to the agreement. These deeds and the Second Escrow were drafted by Attorney CT Page 16192 Giulietti. The Second Escrow contained a condition which required the Giulietti siblings to sign various documents relating to Rockledge LLC, a limited liability corporation which Attorney Giulietti intended to form to continue the development and sale of lots located at 990 Hartford Turnpike, Vernon, Connecticut.
In 1984 Mr. Giulietti had deeded the 990 Hartford Turnpike property to his four children, who formed a partnership known as Rockledge Estates for the purpose of developing the property as a mobile home park. In the fall of 1993, the siblings reached a consensus regarding the development of the Rockledge property. This consensus contemplated the transfer of 20 of the 36 lots to a limited liability company in which Vernon Village would have a percentage ownership as consideration for its investments in infrastructure and development, and that the siblings would own the other percentage of this entity equally and receive individual title to four (4) lots each.
The Second Escrow provided that:
 III. If any of the four children refuse or neglect to sign (execute) any of the instruments (including supporting documentation) referred to in the previous paragraphs by February 28, 1994, that child's deed to the 4 7/8 share shall be destroyed by Frank J. McCoy, Jr. John L. Giulietti may continue this deadline until March 30, 1994, if he feels additional time is needed to complete documentation and signatures and he advises Frank J. McCoy, Jr. of that fact, in which event no such nonsigning child's deed shall be destroyed before March 30, 1994.
Neither the formation of an LLC nor the execution of additional documents regarding Rockledge was requested, or even understood by Mr. Giulietti; they were conditions imposed unilaterally by Attorney Giulietti, as was the concept ofseparate deeds to facilitate destruction of a deed to a noncompliant sibling.
Again, Attorney Giulietti falsely represented to his siblings that their father had agreed to the conditions of the Second Escrow. In an effort to obtain his sisters' signatures on the Rockledge documents Attorney Giulietti sent his sisters a series of letters, some ostensibly from his father, but all drafted by Attorney Giulietti without his father's consent to or understanding of their contents. One such letter, dated January 5, 1994, illustrates the manner in which Attorney Giulietti attempted to manipulate his sisters by claiming that they were CT Page 16193 not acceding to "Father's" wishes. In that letter Attorney Giulietti misrepresented to his sisters that the terms of the Second Escrow were suggested by their father because he "is not very happy about the "indecisiveness' of his four children in reaching a formal agreement regarding operations at Rockledge." In reality, the elder Mr. Giulietti did not ever insist on any connection between Rockledge and the deeds of 325 Kelly Road to his children. Such a connection was created by Attorney Giulietti to serve his own interests.
Attorney Giulietti purposefully misrepresented and confused his father by advising him that his sisters had refused to sign "the Agreement," specifically leading his father to believe that his sisters had not yet signed the Anti-Alienation Agreement, the only agreement of which Mr. Giulietti was aware.
On May 13, 1994, Attorney Giulietti and James Giulietti formed Rockledge LLC. They both signed all documents required under the Second Escrow. Thereafter, on June 15, 1994, Attorney Giulietti and James Giulietti began receiving corresponding rent increases for the 325 Kelly Road property as the only siblings allegedly in compliance with the now outstanding escrow agreement. As of June 15, 1994, the sisters were receiving a lesser rental amount because the deeds to them from their father dated December 31, 1993 were still held in escrow, while those to Attorney Giulietti and James had been released from escrow, at the behest of Attorney Giulietti. At that time each of the sisters was receiving 14.625% of $48,000, or $7,020, rather than the $9,360 that would have reflected the 19.5% ownership now enjoyed by each of the brothers.
On June 16, 1994, an Amendment of and Reinstatement of the December 31, 1993 Escrow Agreement was executed (the "Third Escrow"). This amendment now required that a second LLC be formed regarding 325 Kelly Road to be known as "DOT, LLC." Additionally, this amendment required that all documents referenced in the prior escrow must now be executed by each sibling in order to get their 1993 deed released and recorded, and to receive subsequent equal interests in the 325 Kelly Road land and rent.
Again this second LLC and the Third Escrow were requirements imposed unilaterally by Attorney Giulietti. And again he falsely represented to his sisters that they represented requirements imposed by John J. Giulietti. As with the first LLC and the Second Escrow, John J. Giulietti had no understanding of the CT Page 16194 terms, purposes or complexities of these documents.
In an effort to obtain his sisters' signatures on the Rockledge LLC documents and on the new LLC documents which he intended to draft, Attorney Giulietti composed a letter to be signed by his father which told the sisters that their receipt of future gifts from him was contingent on the signing of "agreements submitted to you by your brothers." It invited them to "please tell me to my face if either of you believe that I have a moral or legal obligation to continue making gifts to either of you." This letter was signed by John J. Giulietti and sent on June 14, 1994. As with all the other letters, Mr. Giulietti did not read this one, but signed it because his son the lawyer lied to him, telling him that Joanne and Anita were being difficult and had still refused to sign "the Agreement."
On June 22, 1994, one week after he imposed the new conditions on the receipt of the 1993 deeds, Attorney Giulietti and James Giulietti formed Dot LLC. On July 14, 1994, after Joanne Hollis and Anita Giulietti refused to sign the Rockledge LLC documents, Attorney Giulietti drafted another letter to his sisters which was signed by himself and his brother which stated, in part, that "Father is instructing Attorney McCoy that there will be no more extensions of time of this escrow agreement and is further instructing Attorney McCoy to destroy his daughters' two individual deeds if his two daughters do not sign in properform the documents presented to Anita during her visit her (sic) this week. Those documents include both Dot LLC and Rockledge Drive LLC." (Emphasis in original). The foregoing was not true. Mr. Giulietti had made no instructions whatsoever concerning the escrow.
On July 19, 1994, at the behest of his son the lawyer, John J. Giulietti executed a deed, prepared by Attorney Giulietti, granting 9-3/4% interest in 325 Kelly Road to Attorney Giulietti and James Giulietti only. On or about July 25, 1994, the December 31, 1993 and July 19, 1994 deeds from John J. Giulietti to Attorney Giulietti and James Giulietti were recorded on the Vernon Land Records.
On July 26, 1994, Joanne Giulietti Hollis signed all documents required of her under the Third Escrow. However, her deeds were not released to her and/or recorded on the Vernon Land Records at anytime thereafter. At this point Attorney Giulietti' s manipulations of his parents and siblings took a particularly CT Page 16195 nasty turn. Apparently realizing how easy it was to withhold the truth from his father, he did not order the recording of the deeds to Joanne that remained in escrow.
Instead, he determined that he would withhold the deeds to Joanne (which would have given her an interest in 325 Kelly Road equal to that of her brothers) in an attempt to secure her assistance in obtaining her sister Anita's signatures on the documents.
Between July 28, 1994 and July 31, 1994 Attorney Giulietti attempted to manipulate Joanne Hollis into pressuring her sister Anita to sign all documents then required by Attorney Giulietti and taking less of a percentage ownership interest in the real estate. In a letter dated July 29, 1994 to his sister Joanne, Attorney Giulietti stated that their father wanted to make a final conveyance of 100% of the Kelly Road property to his children and that, because Anita had not signed the Rockledge and Dot LLC documents that her existing deeds would be destroyed and that "Father" would convey a 28.453% share to Attorney Giulietti, James and Joanne. Attorney Giulietti went on to write:
However, we thought that we should contact you and ask you first before the 28.453% deed was prepared. In the military when a sergeant is reduced in rank from sergeant to private (commonly called "busted") some other corporal or private is promoted to sergeant: in military vernacular this promotion is called a "blood stripe." Some people would decline these promotions for a variety of reasons.
Apparently hoping that Joanne would decline her "blood stripe" additional interest in the Kelly Road property, Attorney Giulietti went on to ask Joanne whether she wanted only a 25% interest, and stated that if she did, then he and James would receive the interest which otherwise would have gone to Anita, leaving James and Attorney Giulietti each with a 30.1875% interest in the property while Joanne would have a 25% interest and Anita only 14.625%.
On August 1, 1994, Attorney Giulietti prepared, and advised John J. Giulietti to sign, a Warrantee Deed transferring his remaining interest in 325 Kelly Road to his sons only, which deed was recorded on that day. Additionally, Attorney Giulietti prepared and advised John J. Giulietti to sign a document entitled "Authorization for Destruction of Deeds, Continued Retention of Dot LLC Documents, and Recordation of Final Deed." CT Page 16196 Thereafter, between August 1, 1994 and December, 1994, Attorney Giulietti continued to tell his sisters that they could receive a 25% ownership interest in Dot LLC and 25% of the 325 Kelly Road land rent if they would sign all documents required under the Third Escrow.
John J. Giulietti continued to believe, right up to the time he filed suit against his son, Attorney Giulietti, that: there was only one "agreement"; it was a four-way equal "partnership" agreement among his four children; Anita had not signed it; but that if she did, all four children I would own 325 Kelly Road and Vernon Village, Inc. in equal shares.
On December 19, 1994, Vernon Village rent to owners was reduced from $48,000 to $2,735 per annum. Said rent reduction was initiated by Attorney Giulietti in an effort to force his sisters to accede to his wishes and control. He misrepresented to his siblings that his father had requested this reduction, drafting a letter for John J. Giulietti's signature which stated, in pertinent part, "I want you, Anita, to sign all the papers concerning `Dot LLC' . . . until all those papers are signed by Anita, I am reducing the rent Vernon Village pays you two and your two brothers . . . I am directing Johnny and Jim to mail each of you checks for $200 which covers the rental period for 325 Kelly Road from July 31 to December 31, 1994." Thus, Attorney Giulietti himself reduced the rental payments to his sisters from $7,020 to $200, while misrepresenting to them that the reduction in rental had been requested by their father.
Thereafter, Attorney Giulietti prepared a letter for his father's signature instructing Attorney McCoy to destroy the deeds being held in escrow for Joanne and Anita. At the time the deeds were destroyed, John J. Giulietti still believed that Joanne and Anita had failed to sign the "Agreement" which would enable them to legally receive interests in 325 Kelly Road. He did not authorize the destruction of the deeds.
The testimony of Mr. Giulietti taken at a deposition[4]
noticed by his son, Attorney Giulietti, on April 15, 1999 expressed his previous trust in his son and his inability to understand why his own son did not do what he asked him to do with respect to the transfers of land and business to his children. Attorney Giulietti showed his father a letter dated August 4, 1994 to Joanne Hollis and Anita Giulietti. As with all letters signed by Mr. Giulietti, this letter had been authored by CT Page 16197 Attorney Giulietti. The letter gave Anita 30 days to reconsider her refusal to sign the Dot LLC documents. Although he knew that he, and not his father, had authored this letter, Attorney Giulietti took the position at the deposition (as he did during the trial) that this letter was evidence of his father's
intentions. When he confronted his father with the letter, Mr. Giulietti responded:
 But you see, you don't understand. I understand if I'm talking to my son and I tell him — I don't care what you put down on the piece of paper. When you trust your son and he's an attorney and you tell him "Look, this is what I really want," whether I said it originally or say it later or say it now, "This is what I want," why my son, who's an attorney, can't do as I say. I don't understand it.
Deposition of April 15, 1999, at p. 102.
Once he had secured majority ownership of 325 Kelly Road for himself and his brother, Attorney Giulietti turned his attention to acquiring stock in Vernon Village, Inc. Although his father trusted him completely, Attorney Giulietti did not have a good relationship with his mother. However, his brother did. Therefore Attorney Giulietti enlisted his brother's aid to bring up the subject of the Vernon Village stock with their mother. On February 3, 1995, James Giulietti convinced Alma Giulietti, their mother, to transfer her stock in Vernon Village to him and Attorney Giulietti. Attorney Giulietti convinced John J. Giulietti to sell them all of his shares in Vernon Village, Inc. without payment of any cash up front, but for a promissory note signed by the brothers for a purchase price totaling $100,000. When Attorney Giulietti first broached the subject of Vernon Village, Inc., which Mr. Giulietti referred to as "the business," Mr. Giulietti was surprised, because he believed that at the time he transferred the 325 Kelly Road real estate to his children, that he had also transferred "the business" to them.
Attorney Giulietti knew that his father wanted his four children to share equally in the 325 Kelly Road property and in the business, Vernon Village, Inc., but he took advantage of his father's mistaken belief that his daughters were being uncooperative (which mistaken belief Attorney Giulietti himself had created) in order to secure sole ownership of the shares in Vernon Village, Inc. for himself and his brother. At the time Alma and John Giulietti made the transfer of stock to their sons, they believed that when Anita signed the "Agreement," then all CT Page 16198 the children would have equal ownership of Vernon Village, Inc. and 325 Kelly Road. This belief was based on representations made to them by Attorney Giulietti.
Attorney Giulietti acted as draftsman and counsel to all involved in the stock transfer. He brought the documents necessary for the stock transfer to his parents house and had his parents sign them while the dinner dishes were being cleared. He did not advise his parents as to his conflict of interest and did not recommend that any other attorney represent them in connection with the stock transfer. He did not advise his parents to retain an appraiser to value the shares of Vernon Village, Inc. Instead he arbitrarily picked the value of $100,000 as the value of the corporate shares. Attorney Giulietti drafted four promissory notes for the purchase price of the stock to be signed by himself and his brother. These notes did not contain default or acceleration provisions, did not provide for interest, and did not include a provision for the payee's recovery of attorneys' fees and collection costs in the event of a default. Attorney Giulietti did not recommend that his parents seek any security for the notes.
Although Mr. Giulietti wanted to give the stock in Vernon Village, Inc. to his children as a gift, Attorney Giulietti structured the transaction as a sale in order to avoid the payment of gift tax. Attorney Giulietti made payments on the notes to his parents, but only after giving himself a raise to cover the payments.
On February 6, 1995, Attorney Giulietti advised his sisters for the first time that he and his brother now owned all the issued and outstanding Vernon Village stock. Prior to that date the sisters believed, correctly, that their father wanted them to share equally with their brothers in the ownership of Vernon Village, Inc. Neither sister would have signed the Anti-Alienation Agreement or any other documents had they known that Attorney Giulietti and James intended to become sole owners of Vernon Village, Inc.
Attorney Giulietti and James Giulietti's ownership of the shares of Vernon Village allowed them thereafter to dictate if and when rent would be paid to their sisters. Further, the brothers' ownership of Vernon Village gave them additional ownership interest in Rockledge LLC, as Vernon Village was a 32% owner of Rockledge. CT Page 16199
After February 1995, the sisters received less annual rent from 325 Kelly Road and less from each Rockledge lot sale than their brothers by virtue of disparate ownership interests. Mr. Giulietti never authorized the reduction in rent from $48,000 per year. If the rental had stayed at that amount through August 31, 1996, then each sister should have received $26,701 in rental more than she actually received.
In September, 1996 the rental to Joanne and Anita was increased to $6000 per year. The reason for the increase as stated in a letter authored by Attorney Giulietti but signed by both of his parents, was to encourage Joanne and Anita to sign the agreements related to the Rockledge development.
During the period between 1991 and 1996 James Giulietti signed the documents that Attorney Giulietti put before him because he believed that his brother was looking out for his best interests and to some extent in order to placate his brother so that he, James, could attend to the business of running the mobile home park. There is no evidence that during the foregoing time period James declined to accept the deeds or stock from his father. But James did believe that Attorney Giulietti would ultimately carry out his father's wishes of an equal distribution of 325 Kelly Road and Vernon Village, Inc. stock to all of his children.
Sometime in 1996 or 1997 the relationship between Attorney Giulietti and his brother James began to deteriorate due to disagreements about how to run the mobile home business and James' unhappiness at Attorney Giulietti's persistent badgering of their sister Anita about signing documents. Some time in 1997 James told Attorney Giulietti that he would not sign any further documents.
Attorney Giulietti apparently feared that interfamily litigation would soon occur. In a desperate attempt to maintain his domination and control over his family on March 25, 1998, he filed a conservatorship petition with the Probate Court in Vernon in which alleged that his mother, Alma, was incompetent. His real purpose in filing the petition was to prevent his mother from using the money she held in her own name to fund his siblings' litigation against him. The Probate Court did not find Mrs. Giulietti to be incompetent. CT Page 16200
The conservatorship petition did cause Mr. Giulietti to finally realize that his son the lawyer had not carried out his wishes. On April 23, 1998 he sent a letter to his two sons in which he stated, in part:
 It has come to my attention that the land known as 325 Kelly Road was not given to my four children by me equally, as was my intention and understanding. It has also come to my attention that the company stock of Vernon Village Inc. I owned was not "sold" equally to my four children as I wished and understood. Since my understanding of the current situation reveals to me that my intentions were not executed, I feel misrepresented and mislead. Therefore, I now demand to both of you that you convey the part of your interest in the land at 325 Kelly Road to your two sisters, so there is equal land ownership among my four children. I also demand that you sell part of your stock interest in Vernon Village, Inc. to each of your sisters at the same favorable terms and price I gave to the both of you.
If Joanne and Anita had received a full 25% of the rental for the period from September, 1996 to the present, then they would have received an additional $24,143. The total amount that Joanne and Anita should have received if they had been treated as equal owners of the property, as they should have been, was $50,844 each.
At approximately the same time period in which Attorney Giulietti authored the Second Escrow, he began representing his siblings and his parents in a lawsuit. This lawsuit arose out of a dispute between the Giuliettis and Max Javit, who owned property abutting 325 Kelly Road. In the lawsuit the Giuliettis alleged contamination by Javit of some of the wells which provided water to the mobile home park In the spring of 1993, Attorney Giulietti commenced the lawsuit, entering appearances as attorney for his parents and siblings. During the several year duration of that lawsuit, Attorney Giulietti acted as counsel and rendered legal advice to each family member concerning various aspects of the suit.
At no time during the course of the transactions described above did Attorney Giulietti ever advise his family members to obtain counsel. He did not disclose to anyone in his family that he had a potential conflict of interest under the Rules of Professional Conduct (the "Rules") and never notified his siblings of said conflict, in writing, as required by the Rules, or advised them to engage separate counsel. Ironically, Anita CT Page 16201 Giulietti, who is not an attorney, suggested that Attorney Giulietti should refrain from drafting documents concerning the Rockledge Development because he was "too close" to the situation. Attorney Giulietti "hired" Attorney McCoy to prepare the Rockledge documents. However, not wanting to incur legal fees, Attorney Giulietti ended up drafting all the Rockledge documents anyway.
Discussion of Law and Ruling
Malpractice Action
Despite the pain that their son Attorney Giulietti has caused them, John and Alma Giulietti have brought an action against him not from any desire for vengeance or damages, but in order to attempt to effectuate Mr. Giulietti's intent to distribute his land and business equally to his children. This action has been referred to as the "Malpractice" action, but it also alleges that Attorney Giulietti engaged in fraudulent conduct. Count One alleges that Attorney Giulietti fraudulently induced his parents to transfer the stock in Vernon Village, Inc. to their two sons and Count Six alleges that Attorney Giulietti fraudulently induced John J.. Giulietti to transfer a disproportionately large interest in 325 Kelly Road to his sons.
"Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." (Citations omitted; internal quotation marks omitted.) Billington v. Billington,220 Conn. 212, 217, 595 A.2d 1377 (1991). The party asserting such a cause of action must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as "clear and satisfactory" or "clear, precise and unequivocal."Rego v. Connecticut Ins. Placement Facility, 219 Conn. 339, 343,593 A.2d 491 (1991); Kilduff v. Adams, Inc., 219 Conn. 314, 327,593 A.2d 478 (1991).[5]
The court finds that the plaintiffs have proven by clear and convincing evidence that Attorney Giulietti fraudulently induced CT Page 16202 his father to transfer the 325 Kelly Road property in disproportionate amounts to himself and his brother and to fail to transfer equal portions of that property to his sisters, Joanne Giulietti Hollis and Anita Giulietti and fraudulently induced his father to transfer the stock in Vernon Village, Inc. and to cause his wife to transfer her stock in Vernon Village, Inc. to himself and his brother to the exclusion of his sisters.
The Second Count of the Complaint sounds in legal malpractice and alleges in pertinent part:
 1. At all times hereinafter mentioned the Defendant was an attorney at law admitted to the Bar of the State of Connecticut and engaged in the practice of his profession.
 2. On or about February of 1995 the Plaintiffs retained and employed the Defendant to advise the Plaintiffs in certain transactions involving the transfer of the corporation known as Vernon Village, Inc to their children. Prior thereto the Defendant had acted as Plaintiffs' attorney in many matters and Defendant knew that Plaintiffs relied upon him as their attorney.
 3. Prior to February of 1995, the Defendant had accepted such employment and entered into a long standing attorney/client relationship with the Plaintiffs.
 4. When it appeared that the Defendant was to be one of the purchasers/transferees of the stock in Vernon Village, the Defendant failed in his duty to advise the Plaintiffs that the Plaintiffs should obtain independent counsel with respect to the transfer of the business or other assets.
 5. Instead, the Defendant presumed to handle the entire transaction. The Defendant carelessly and negligently caused their stock to be transferred to only two of the Plaintiffs' four children and drafted four (4) Notes to represent the consideration for the transaction. The Notes did not contain a default provision, a cost of collection provision, an acceleration provision; and Defendant failed to provide a security interest in the event of any default. The absence of these terms was highly favorable to the Defendant and unfavorable to the Plaintiffs. The Defendant failed to disclose and/or failed to explain the effect of the lack of these terms in the Notes and the Plaintiffs would not have accepted said Notes in exchange for their interests in CT Page 16203 Vernon Village had the Defendant fully explained the effect of the documents which he prepared and had the Plaintiffs sign. The Defendant by these actions failed to utilize the skill and care which a reasonably competent lawyer in the area should have possessed.
The Fourth Count of the Complaint alleges in pertinent part:
 2. On or about December 1990 the Plaintiffs retained and employed the Defendant to effectuate the transfer of certain real property owned by the Plaintiffs to the Plaintiffs' four children; namely the Defendant John L. Giulietti, James Giulietti, Anita Giulietti, and Joanne Giulietti Hollis. It was the Plaintiffs' expressed intent that their interest in said real property be transferred in equal portions to their four children over the course of several years.
This Count further alleges that Attorney Giulietti misrepresented the contents-of deeds he prepared for his father's signature in 1993, and 1994 and negligently failed to advise his parents of the conflict of interest inherent in his preparations of deeds of which he was a beneficiary.
In American National Fire Ins. Co. v. Schuss, 221 Conn. 768,777, 607 A.2d 418 (1992) the Connecticut Supreme Court stated that "intentional tortious conduct will ordinarily also involve one aspect of negligent conduct, namely, that it falls below the objective standard established by law for the protection of others against unreasonable risk of harm." Thus it goes without saying that an attorney who fraudulently induces a client to act in a manner inconsistent with the client's wishes, has deviated from the applicable standard of care.
The court finds that the plaintiffs have proved by clear and convincing evidence that there was an attorney client relationship between Attorney Giulietti and his parents and that Attorney Giulietti deviated from the standard of care applicable to an attorney practicing law in similar circumstances when he fraudulently induced his father to transfer the 325 Kelly Road property in disproportionate amounts to himself and his brother and to fail to transfer equal portions of that property to his sisters, Joanne Giulietti Hollis and Anita Giulietti and fraudulently induced his father to transfer the stock in Vernon Village, Inc. and to cause his wife to transfer her stock in Vernon Village, Inc. to himself and his brother to the exclusion CT Page 16204 of his sisters.
The plaintiffs have also alleged that Attorney Giulietti committed malpractice in that he undertook to represent his parents notwithstanding the clear conflict between the interest of his father in transferring the 325 Kelly Road land and Vernon Village, Inc. stock equally to his four children, and the interest of Attorney Giulietti in obtaining more of the land and business than his sisters and in controlling the Giulietti family's business enterprises.
Lawyers can be guilty of malpractice for merely failing to disclose potential conflicts of interest without engaging in any fraud or self dealing. S.M.S. Textile Mills, Inc. v. Brown,Jacobson, Tillinghast, Lahan King, 32 Conn. App. 786, 796-97,631 A.2d 340 (1993); Woodruff v. Tomlin, 616 F.2d 924, 936-937
(6th Cir. 1980), cert. denied 449 U.S. 888 (1980); Schmidt v.Frankewich, 819 P.2d 1074, 1079 Col.Ct. App. 1991); Wick v.Eismann, 122 Idaho 698, 838 P.2d 301, 303 (1992); CrestInvestment Trust, Inc. v. Comstock, 23 Md. App. 280,327 A.2d 891, 904 (1974). Therefore, where the attorney has acted fraudulently, a discussion of his ethical violations as a basis for relief seems somewhat superfluous.
In this case Attorney Giulietti not only failed to disclose a potential conflict of interest, he created an actual conflict ofinterest in which he benefitted [benefited] and his clients suffered.
Rule 1.7 of the Code of Professional Conduct provides, in part:
 (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (1) The lawyer reasonably believes the representation will not be adversely affected; and
 (2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
Attorney Giulietti violated Rule 1.7 because the moment he realized that his sisters' interests were prejudiced, while his CT Page 16205 own interests were enhanced, he knew that his representation of his parents with respect to their transfer of the 325 Kelly Road land and the stock of Vernon Village, Inc. was materially limited by his own interests.
The Third and Fifth Counts of the Complaint allege that the plaintiffs contractually engaged Attorney Giulietti to transfer the stock in Vernon Village, Inc.(Third Count) and to transfer the 325 Kelly Road land (Fifth Count) in equal shares to their children. The plaintiffs have not addressed the breach of contract claims in their Post Trial Brief. The court would find in favor of the plaintiffs on the contract counts if those counts alleged merely that in 1990 Mr. Giulietti and Attorney Giulietti agreed that Attorney Giulietti would handle his parents affairs and see that the 325 Kelly Road and the stock in Vernon Village, Inc. was transferred in equal shares to the Giulietti children. However, those counts go further than that. For example the Fifth Count contains the allegation that, "In the years of 1993 and 1994, the defendant was contractually engaged to transfer the plaintiffs remaining interest in the land to plaintiffs four children equally as before." However, the evidence showed that in those years Mr. Giulietti deeded the 325 Kelly Road land to his sons only in reliance on the misrepresentations of Attorney Giulietti as set forth above. Such evidence is inconsistent with the aforementioned contract claims. The court finds in favor of the defendant Attorney Giulietti on the Third and Fifth Counts.
Remedies with respect to Malpractice Complaint
In their Claims for Relief the plaintiffs seek attorneys fees and costs for bringing the action and they also seek an order voiding all transactions made by Attorney Giulietti with respect to the stock of Vernon Village, Inc and a return of that stock to the plaintiffs. The plaintiffs also seek an order that each of their children, who were made defendants to this action by the Substituted Complaint dated February 9, 1999, deed back their interests in 325 Kelly Road to the plaintiffs.
In argument to the court after trial and in their Post Trial Brief, the plaintiffs have indicated that the return of all the land and all the stock to them would cause estate planning complications and have indicated a preference for judicial intervention such that each of their four children end up owning 25% of the stock in Vernon Village, Inc. and a 25% interest in the Kelly Road land. CT Page 16206
Under Connecticut General Statutes § 52-22 the superior court "in the exercise of its equitable jurisdiction may pass title to real property by decree, without any act on the part of any party holding title to the real property, when in its judgment it is the proper mode to carry the decree into effect." The superior court also has the power to order reformation of deeds and contracts in the case of mistake of one party coupled with actual or constructive fraud, or inequitable conduct on the part of the other. Lopinto v. Haines, 185 Conn. 527, 531-532,441 A.2d 151 (1981); Moffett, Hodgkins Clarke Co. v. Rochester,178 U.S. 373, 385, 20 S.Ct. 957, 44 L.Ed. 1108 (1900); Patalano v.Chabot, 139 Conn. 356, 359, 94 A.2d 15 (1952); Home Owners' LoanCorporation v. Stevens, 120 Conn. 6, 9, 179 A. 330 (1935); 27 Am.Jur.2d 555, Equity, § 33; 45 Am.Jur., Reformation of Instruments, § 30; Greenwich Contracting Co. v. BonwitConstruction Co., 156 Conn. 123, 126, 239 A.2d 519 (1968).
The Warrantee Deed from John J. Giulietti dated August 1, 1994 and recorded at volume 992, page 329 of the Vernon Land Records, transferred the remainder of Mr. Giulietti's interest in 325 Kelly Road to Attorney Giulietti and James Giulietti. That deed was certainly the product of fraudulent misrepresentations by Attorney Giulietti and a mistaken belief by Mr. Giulietti that his daughters were refusing to sign the "Agreement" and therefore, could not legally receive any further interests in the Kelly Road property. Therefore, it is subject to reformation by the court.
The plaintiffs and their children James, Anita, and Joanne, wish to see the property deeded equally to the four children of the plaintiffs. Even Attorney Giulietti has conceded that if the court does change the present ownership of 325 Kelly Road, it should do so by reformation of the deed. Based on the foregoing, that aforementioned deed is hereby ordered reformed such that it transfers a .625% interest to James Giulietti, a .625% interest to John L. Giulietti, a 10.375% interest to Joanne Giulietti Hollis and a 10.375% interest to Anita Giulietti. The plaintiffs should prepare the appropriate notice of the reformation for the land records which should contain the following: 1) the volume and page, grantor and grantees of the original deed, 2) percentage interest granted to each grantee under this order, 3) that James Giulietti, John L. Giulietti, Joanne Giulietti Hollis, and Anita Giulietti each now have a 25% interest in the 325 Kelly Road property, 4) that the interest of John L. Giulietti is CT Page 16207 encumbered by a constructive trust in the amount of $120,858 in favor of Joanne Hollis and Anita Giulietti, and 5) the title, docket number, judicial district of this action, the partition action and the date of this order.
The assignments of the stock in Vernon Village, Inc. dated February 3, 1995 were also procured by the fraudulent misrepresentations of Attorney Giulietti and mistake on the part of Mr. Giulietti and his wife. They are also subject to reformation. At the time of the assignments, John J. Giulietti owned 6 shares of stock and transferred three shares each to his sons, and his wife, Alma, owned four shares and transferred two shares each to her sons. Those assignments are hereby ordered reformed as follows: 1) one and one half shares owned by Mr. Giulietti are transferred to each of his children, and 2) one half share owned by Alma Giulietti is transferred to each of her children. The result of the foregoing reformed assignments is that James Giulietti, John L. Giulietti, Joanne Hollis and Anita Giulietti each own 2.5 shares in Vernon Village, Inc.
The plaintiffs have listed attorneys' fees among their Claims for Relief. This court would award such fees as punitive damages based on the fraudulent conduct of Attorney Giulietti. Even parental affection might be insufficient to effect the plaintiffs' forgiveness of Attorney Giulietti for the familial and legal crisis he has caused. Apparently, it is not. The plaintiffs do not seek to recover their attorneys fees from Attorney Giulietti. They request only that Attorney Giulietti pay for the taxes and transfer fees that may be incurred as a result of the recording of the reformed deeds. The court hereby orders that Attorney Giulietti make payment of such amounts to the plaintiffs within 15 days after the plaintiffs or their agents or attorneys advise him in writing of the amount of such taxes and transfer fees.
Partition Action
In the Partition action the plaintiffs James Giulietti and Joanne Giulietti Hollis seek to void the Anti-Alienation Agreement because it was procured by fraud, undue influence and in violation of Rule 1.8 of the Code of Professional conduct. They further seek a reformation of the deeds from Mr. Giulietti to his children such that each child obtains a 25% ownership in the 325 Kelly Road property. Finally they seek an appointment of a committee to sell the property at private auction. CT Page 16208
The right to partition is within the penumbra of rights a landowner derives by virtue of the record deed. Scovil v.Kennedy, 14 Conn. 349, 361 (1841); Johnson v. Olmstead,49 Conn. 509, 517 (1882). This common law right has been codified in Connecticut by Connecticut General Statutes § 52-495 which states: [c]ourts having jurisdiction of actions for equitable relief may, upon the complaint of any person interest, order the partition of any real property held in joint tenancy, tenancy in common, co-tenancy or tenancy in tail parties may enter into reasonable agreements which will expressly or impliedly debar them from seeking a partition. See Rayhol Co. v. Holland,110 Conn. 516, 148 A. 358 (1930). The Rayhol Court's rationale is consistent with the law of other jurisdictions; written agreements not to partition are sanctioned if they are: "fair and equitable"; in writing; and for a reasonable period of time. Seee.g. Levy v. Herson, 127 Misc.2d 634, 486 N.Y.S. 2d 860 (1985);Kuck v. Cropper, (1978) WL 22465 (Delaware Chancery) andGoodpasture v. Goodpasture, 115 N.J. Super. 189, 278 A.2d 531
(1971).
As more fully set forth above, the Anti-Alienation Agreement was not "fair and equitable" and was not for a reasonable period of time. But, more to the point, the Anti-Alienation Agreement was procured by fraud in the inducement and, therefore, voidable.Dorsey v. Mancuso, 23 Conn. App. 629, 635, 583 A.2d 646 (1990). The elements of fraudulent misrepresentation are as follows: (1) a false representation must be made as to a statement of fact; (2) the statement was untrue and known by the defendant to be untrue; (3) the statement was made to induce the plaintiff to act; and (4) the plaintiff acted on the false representation to her detriment. Kavarco v. T.J.E., Inc., 2 Conn. App. 294, 295-96,478 A.2d 257 (1984); Dorsey v. Mancuso, supra.
In this case Attorney Giulietti falsely represented to his siblings that 1) the terms of the Agreement had been dictated by Mr. Giulietti, 2) Mr. Giulietti required that they sign the Agreement as a condition of receiving their gifts of the 325 Kelly Road land, and 3) the signing of the Agreement was the only condition of their gifts of land. The foregoing statements were known by Attorney Giulietti to be untrue at the time he made them. They were made to obtain his siblings' signatures on the Agreement and in reliance on those representations the siblings did sign the Agreement. CT Page 16209
"Rescission of a contract is an appropriate remedy if there has been a material misrepresentation of fact upon which a party relied and which caused [her] to enter the contract." Kavarco v.T.J.E., Inc., supra, 298. "Rescission, simply stated, is the unmaking of a contract. It is a renouncement of the contract and any property obtained pursuant to the contract, and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract." Id., 299. Dorsey v.Mancuso, supra, at 635.
The Anti-Alienation Agreement is hereby ordered void and of no effect.
The plaintiffs have argued that Attorney Giulietti's violation of the Rule of Professional Conduct provides an alternate basis to void the Anti-Alienation Agreement. Rule 1.8(a) of the Rules of Professional Conduct requires that a lawyer with a pecuniary interest in a transaction disclose, in writing, such interest before engaging in said transaction. John L. Giulietti had a vital pecuniary interest in the Agreement. The 325 Kelly Road land was the site of the family business, virtually his sole source of income. Attorney Giulietti has readily admitted that he did not disclose his pecuniary interest to any of his siblings or alert them that that interest created a conflict of interest. Instead, he has denied that an attorney/client relationship existed. This is rather astounding considering that the other parties interested in the Agreement were his own siblings, whom he represented in pending litigation.
The Preamble of the Rules of Professional Conduct provides that "A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others." The foregoing language clearly implies that a lawyer who violates the spirit, letter, and intent of those rules should not prosper therefrom. The plaintiffs argue that it would be grossly inequitable to acknowledge John L. Giulietti's violation of Rules 1.8 and 1.7, yet allow him to retain the benefit of the very agreement he procured from his siblings as a result of those violation(s).
As was stated above with respect to the claims of malpractice, in light of Attorney Giulietti's fraudulent conduct, there is no real need to rely on his clear violations of the CT Page 16210 Rules of Professional Conduct as a basis for relief. However, this court is deeply concerned both by those violations and by Attorney Giulietti's apparent failure to acknowledge or appreciate their seriousness. He not only violated the rules, he did so from an apparent pathological need to control his family while furthering his own interests.
 The right to partition is founded on the principle that no person can be compelled to remain the owner with another of real property, even if the party seeking partition willingly entered into the joint ownership. Johnson v. Olmsted, 49 Conn. 509, 517 (1882). General Statutes § 52-495[4] confers an absolute right of partition upon any person holding real property as a tenant in common with others. Delfino v. Vealencis, 181 Conn. 533, 536-37, 436 A.2d 27
(1980). In those cases where the court finds that a sale of the property would better promote the interests of the owners, the court may order such a sale. General Statutes § 52-500;[5] Delfino v. Vealencis, supra, 536. This jurisdiction has long favored partition in kinds or physical division, over partition by sale. Borzencki v. Estate of Stakum, 195 Conn. 368, 372, 489 A.2d 341 (1985); Delfino v. Vealencis, supra; Harrison v. International Silver Co., 78 Conn. 417, 420, 62 A. 342 (1905); Johnson v. Olmsted, supra. Because we presume that partition in kind is in the best interests of the owners, the burden of proof rests on the party seeking a sale to demonstrate that it is the better remedy. Borzencki v. Estate of Stakum, supra; Delfino v. Vealencis, supra, 538. This burden may be carried by satisfying two conditions: (1) the physical attributes of the property make partition in kind impracticable or inequitable; and (2) the interests of the owners would better be promoted by partition by sale. Borzencki v. Estate of Stakum, supra; Delfino v. Vealencis, supra, 537-38. A plaintiff in an action for partition seeks to sever or dissolve involuntary joint ownership in real property. In furtherance of that objective, a court is limited to rendering a judgment of either partition in kind or by sale of the real property; Klaus v. Klaus, 143 Conn. 218, 221, 121 A.2d 283 (1956); thus terminating the ownership relationship between the parties.
Wilcox v. Willard Shopping Center Associates, 208 Conn. 318,325-326, 544 A.2d 1207 (1988).
The court finds that the 325 Kelly Road property has physical CT Page 16211 attributes which make partition in kind impracticable or inequitable. There are approximately 212 mobile homes currently located on the 325 Kelly Road property. Two thirds of those mobile homes are owned by tenants and one third by Vernon Village, Inc. Vernon Village, Inc. is the corporation which operates the mobile home park business with no written lease. It would be impossible to divide the real estate and the mobile homes located on it into quarters. The source of drinking water for the mobile home park is located on a contiguous piece of property also owned by the four Giulietti siblings jointly and severally. Several years ago that source of water became temporarily contaminated, which required the acquisition of an alternate source of water. It is not probable that the four siblings could cooperate to resolve a similar problem if it arose while they each owned a 25% portion of the property. Moreover, it is not known whether the Department of Consumer Protection, which issues licenses to owners of mobile home parks, would convert the existing license for the Vernon Village mobile home park into four separate licenses. Without a license, no sibling could operate his or her quarter of the mobile home park. Finally, four small mobile home parks might each require the creation of separate roadways through which to gain access to each park.
The court also finds that the plaintiffs have proved that a partition by sale would better serve the interests of the owners, than a partition in kind. Given the actions taken by Attorney Giulietti, it is probable that his siblings do not wish to continue to deal with him as a contiguous quarter owner of the mobile home park. The sale would permit Attorney Giulietti to buy the 325 Kelly Road property himself, and in the process, buy out his siblings' interest in that property, or it would permit James Giulietti, Joanne Hollis and/or Anita Giulietti to purchase the property, buying out Attorney Giulietti's interest therein in the process.
All parties have requested that the court order the property to be sold by private sale. While this is an unusual occurrence, it is warranted in light of the circumstances. The Giulietti family wishes to continue to operate Vernon Village, and their family-controlled corporation, Vernon Village, Inc. owns trailers and operates a business on the land. Based on the foregoing, the court appoints Attorney Thomas FitzGerald of 773 Main Street, Manchester, Connecticut to act as committee to sell the 325 Kelly Road land at a private auction wherein the only permitted bidders will be James Giulietti, John L. Giulietti, Joanne Hollis, and CT Page 16212 Anita Giulietti. For the purposes of the partition sale, the court finds that the property has a fair market value of two million nine hundred thousand dollars ($2,900,000). The committee will sell the property to the highest bidder who presents a seventy five thousand dollar deposit in cash or certified check. The buyer will be required to close on the purchase of the property within thirty days of this court's approval of the sales price, committee fee and the committee deed. Failure to close within said thirty day period will result in a forfeit of the deposit and the committee will then sell the property to the next highest bidder on the same terms as those set forth above.
Joanne Hollis has requested that the court should impose a constructive trust upon the interest of the defendant John L. Giulietti in the 325 Kelly Road property, and surcharge and deduct from that interest the amount of $120,858, which amount is composed of $50,844, the amount of rental which Joanne Hollis and Anita Giulietti each would have received if they had received rental on an equal ownership basis with their brothers from July 1, 1993 through June 30, 1997, $19,143, the amount each sister would have received if she had received rental on an equal ownership basis with her brothers from July 1, 1997 to October, 1999 and $19,170, the amount of rental in excess of 25% which Attorney Giulietti received from July 1, 1997 to October, 1999.
Courts of equity have often resorted to various creative solutions in order to avoid unjust enrichment of a given litigant. One of the devices employed is that of a constructive trust created for the benefit of the party whose interests would otherwise be prejudiced.
The requirements for imposition of a constructive trust were set out very well in CBS Surgical Group, Inc. v. Holt,37 Conn. Sup. 555, 559, 426 A.2d 819 (1981):
 Before the constructive trust can be created, however, there must be a duty owed, or a fiduciary or otherwise special relationship between the parties. "Where there is no proof of an actual confidential relationship and the law looks only to a presumption of fraud arising out of the relationship of the parties to each other, that relationship must be one where there is ordinarily a special trust and confidence and the likelihood of the exercise of personal influence and control such that one would expect of the other fair dealing and mutual consideration." Worobey v. Sibieth, supra
CT Page 16213 [136 Conn. 352, 71 A.2d 80 (1949)]. "A constructive trust arises `when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled. . . .' 3 Pomeroy, Eq.Jur. (4th Ed.) p. 2370." Van Auken v. Tyrrell, 130 Conn. 289, 291-92 33 A.2d 339 (1943); see Hieble v. Hieble, supra
[164 Conn. 56, 316 A.2d 777 (1972)].
Here, it is quite clear that the defendant-son-attorney had an attorney-client relationship in several different matters with his sisters, Joanne Hollis and Anita Giulietti. He also had a fiduciary duty to them in his distribution of his father's real estate. As set forth above, the defendant Attorney Giulietti made various false representations to his sisters concerning the wishes of their father with respect to the 325 Kelly Road land. If the sisters had known that the signing of the Anti-Alienation Agreement and other conditions imposed on their receipt of interest in the Kelly Road property were unilaterally imposed by Attorney Giulietti and not their father, they could have alerted their father earlier that his son was not following the father's wishes or instructions. By the same token, if Mr. Giulietti had known that Attorney Giulietti was lying to him when he stated that his sisters were not "cooperating" or not signing the "Agreement," he would have taken action to insure that his daughters shared equally in the real estate and in the rental income therefrom. In short, Attorney Giulietti's fraudulent misrepresentations, and unilateral actions in drastically lowering the rental received by his sisters from 325 Kelly Road caused his sisters to lose rental they otherwise would have received, and caused Attorney Giulietti to receive more rental than he should have as a 25% owner of the real estate.
Plaintiff Hollis has not asked for the imposition of a constructive trust upon the interests of her brother, James Giulietti because James was never the active party in any of the misrepresentations made, was not an attorney and not acting as a fiduciary. Ms. Hollis argues that James was largely unaware of exactly what Attorney Giulietti was trying to do because James was extremely busy conducting virtually all of the business of Vernon Village, Inc. as well as that of Rockledge while his brother drafted meaningless corporate minutes and mischievous correspondence. While James is not completely free of blame, it is true that he is not an attorney and the misrepresentations made by Attorney Giulietti to his sisters were also made to James. CT Page 16214
Moreover, James first initiated the real estate partition action even though it necessarily involved his giving up a percentage of ownership because he realized it was the only direct legal tool available in which he could attempt, along with his siblings, to reconstruct the plan his parents had intended all along.
Based on the foregoing, equity requires that a constructive trust be imposed on John L. Giulietti's share of the 325 Kelly Road property in the amount of $120,858 plus interest at the rate of 10% from the date hereof with respect to back rent owing each of his sisters, and excess rent taken, and that Joanne Hollis and Anita Giulietti each receive $60,429 from Attorney Giulietti's share of the 325 Kelly Road land upon the sale thereof.
Corporate Dissolution Action
The Court makes the following additional findings with respect to the corporate dissolution action. As of the date this action was commenced James Giulietti and Attorney Giulietti each owned five shares of the issued and outstanding common stock of Vernon Village, Inc., a Connecticut corporation in good standing with the Connecticut Secretary of State. As of the date this action was filed the Board of Directors of Vernon Village, Inc. was comprised of James Giulietti and Attorney Giulietti and there was a deadlock between them, which deadlock could not be resolved by a vote of the shareholders.
In response to the complaint seeking a dissolution of Vernon Village, Inc., which was filed by James Giulietti, Attorney Giulietti raised three special defenses and one counterclaim. In his first special defense, Attorney Giulietti asserted his alleged right to purchase the shares of James Giulietti pursuant to Connecticut General Statutes § 33-900. The second special defense alleged that James Giulietti should be removed as an officer/director for various breaches of fiduciary duty including, but not limited to, malfeasance in connection with various accounting practices, misuses of Vernon Village resources, etc. In his third special defense, Attorney Giulietti alleged specific performance of an agreement of James Giulietti to sell his shares in Vernon Village, Inc. and interest in the 325 Kelly Road land to Attorney Giulietti. The counterclaim mirrored the allegations, of the second special defense, that is, that James Giulietti had breached fiduciary duties as set forth CT Page 16215 in his second special defense.
James Giulietti claims that he incurred legal expenses in the amount of $25,000 in defense against the counterclaim which sought his removal as an officer and director of Vernon Village. Attorney Giulietti withdrew (without receiving any consideration) all special defenses and counterclaims in the course of the trial of the corporate dissolution action.
James Giulietti argues that since Attorney Giulietti withdrew his counterclaim, James was wholly successful in the defense of the counterclaim, and seeks indemnification from Vernon Village, Inc. pursuant to Connecticut General Statutes § 33-772, which provides:
 A corporation shall indemnify a director who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which he was a party because he was a director of the corporation against reasonable expenses incurred by him in connection with the proceeding.
Since Attorney Giulietti did withdraw his counterclaim, James Giulietti was wholly successful in the defense of the counterclaim "on the merits or otherwise." Sicaras v. City ofHartford, 44 Conn. App. 771, 775-776, 692 A.2d 1290 (1997) (a withdrawal of action has the same effect as a final judgment); H.G. Bass Associates, Inc. v. Ethan Allen, Inc., 26 Conn. App. 426,431, 601 A.2d 1040 (1992); see also Baker v. Cordisco,37 Conn. App. 515, 520, 657 A.2d 230 (1995). Connecticut General Statutes § 33-770 defines "expenses" as including legal fees. Therefore, the court finds that James Giulietti reasonably expended $19,866.66 in defense of the counterclaim interposed by Attorney Giulietti, which counterclaim was withdrawn without consideration during trial and enters judgment in favor of James Giulietti against Vernon Village, Inc. in that amount on the Second Count of the Amended Complaint dated July 7, 1999.
When James Giulietti filed this action, Attorney Giulietti filed an election pursuant to Connecticut General Statutes §33-900, which provides that "(a) in a proceeding by a shareholder under subdivision (1) of subsection (a) or subdivision (2) of subsection (b) of section 33-896 to dissolve a corporation that has no shares listed on a national securities exchange . . . . the corporation may elect or, if it fails to elect, one or more CT Page 16216 shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares. An election pursuant to this section shall be irrevocable unless the court determines that it is equitable to set aside or modify the election." The statute also provides that the court will determine the value of the shares after a hearing if the parties are unable to agree upon a value.
Based on the court's reformation of the ownership of Vernon Village, Inc. stock, this action is moot. Since the four siblings will each own 25% of the stock of Vernon Village, Inc., as a result of this decision, the deadlock alleged in the complaint does not exist.
Even if the dissolution action were not moot, Attorney Giulietti's election to purchase the corporate shares should fail. It would be inequitable to allow Attorney Giulietti to exercise any election because his fraudulent conduct was responsible for creating the corporate deadlock situation. Moreover, his brother James has actually operated the corporation's mobile home business during the pendency of this litigation and for many years prior thereto. In addition, Attorney Giulietti has failed to introduce any evidence as to the value of the Vernon Village stock as required by § 33-900. Judgment may enter in favor of the defendants on the first count of the complaint.
Usurpation of Corporate Opportunity Action
In the so-called usurpation of corporate opportunity case, Vernon Village, Inc. ("Vernon Village") claims that while Attorney Giulietti was acting as an officer and director of the corporation, he learned of an opportunity to purchase two parcels of property adjacent to Vernon Village, one of which contained two mobile homes, formerly owned by Neva Capo, who was an aunt of Attorney Giulietti, and his siblings, James, Anita and Joanne. The complaint further alleges that Attorney Giulietti failed to present this opportunity to Vernon Village and ultimately purchased the property himself over the objections of his brother, James, who at the time owned 50% of the stock of Vernon Village, and Joanne Hollis, who was then a director of Vernon Village.
The court makes the following additional findings of fact with respect to this action. When Vernon Village was incorporated CT Page 16217 Alma and John J. Giulietti appointed their son John L. Giulietti as secretary of the corporation, a position which he has held continuously since 1966. Vernon Village consists of approximately 212 mobile homes. Some of the mobile homes are owned by the corporation which then leases the units to tenants in exchange for rent. Other mobile homes are owned by individuals who pay Vernon Village a service fee for the use of water, sewer, and electricity. Around the time the Giulietti parents transferred their stock to their sons (February, 1995), Vernon Village elected a new Board of Directors consisting of the two Giulietti brothers and their sister, Joanne Hollis. On March 7, 1998 Mrs. Hollis resigned as a director due to the infighting between her brothers.
Sometime in early to mid 1997 James Capo, a cousin of Attorney Giulietti and his siblings, visited the corporate office of Vernon Village located at 325 Kelly Road. He told only Attorney Giulietti that the Capo family wanted to sell two parcels of land located adjacent to Vernon Village which had been owned by Neva Capo and that the executors of Neva Capo's estate intended to list the parcels for sale with Matthew Island Realty. At all times relevant to this action, two mobile homes were located on one of the Capo parcels. They obtained water, electricity and sewer connections from Vernon Village.
At the time Attorney Giulietti learned that the Capo properties were available for sale he was both an officer and director of Vernon Village. Upon learning that the Capo properties were for sale, Attorney Giulietti contacted his father and told him that the property was for sale and suggested that he and his father purchase the property. Attorney Giulietti then began negotiating with the Capo family and ultimately reached an agreement to purchase both parcels and the mobile homes located thereon for $22,500.
Mr. Giulietti contributed $20,700 to the purchase price, while Attorney Giulietti paid only $1,800. Notwithstanding his minimal financial contribution, Attorney Giulietti virtually insured that within a short period of time, he would be the sole owner of the two parcels. Attorney Giulietti instructed the attorney who prepared the deeds to designate the grantees as "John J. Giulietti and John L. Giulietti as joint tenants with aright of survivorship." Mr. Giulietti was 82 years old at the time. (Emphasis added). CT Page 16218
Sometime prior to the closing on the Capo properties, Attorney Giulietti contacted his sister, Joanne Hollis, and told her that he was purchasing the properties. At the time of the conversation, Mrs. Hollis was a member of the Vernon Village, Inc. Board of Directors. Mrs. Hollis told Attorney Giulietti that the properties and the mobile home located thereon should "go to Vernon Village." Attorney Giulietti responded that "that is not going to happen because then James will get his mitts on it."
It was not until the morning of the closing, December 23, 1997, that Attorney Giulietti disclosed to his brother James that the properties were for sale and that he was purchasing them. James Giulietti also objected to the purchase and advised Attorney Giulietti that Vernon Village should purchase the Capo properties.
The acquisition of the Capo properties was a favorable opportunity for Vernon Village, which would have purchased the properties to add to its existing mobile home park business. While Vernon Village does not own the 325 Kelly Road property, it did own other real estate.
In its Complaint[6] Vernon Village alleges that Attorney Giulietti's purchase of the Capo properties without first offering the opportunity to the corporation and without obtaining approval of the shareholders or directors of Vernon Village constitutes the following: a breach of his common law fiduciary duties as an officer and director of the corporation (Count One); a breach of his statutory duties as an officer of the corporation under Connecticut General Statutes § 33-765 (Count Two); and a breach of his statutory duties as a director of the corporation under Connecticut General Statutes § 33-756 (Count Three). In the Fourth Count, Vernon Village seeks the imposition of a constructive trust on the Capo properties. Finally, in the Fifth Count, the corporation requests the removal of Attorney Giulietti as a director of Vernon Village pursuant to the powers vested in this court under the provision of § 33-743 of the Connecticut General Statutes.
An officer and director occupies a fiduciary relationship to the corporation and its stockholders. Katz Corporation v. T. H.Canty Co., 168 Conn. 201, 207, 362 A.2d 975 (1975). The fiduciary relationship imposes a position of the highest trust and, therefore, the officer or director is bound to use the utmost good faith and fair dealing in all his relationships with CT Page 16219 the corporation. Id. "`Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.'"Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401,407, 456 A.2d 325 (1983) quoting Adams v. Williamson,150 Conn. 105, 112, 186 A.2d 157 (1962) (citations omitted).
In addition to common law fiduciary duties, officer and directors also have statutory duties. Connecticut General Statutes § 33-756 (a) (directors) and § 33-765 (a) (officers) require that officers and directors discharge their duties "(1) In good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner he reasonably believes to be in the best interests of the corporation."
In a case where a claim of usurpation of a corporate opportunity is made, the plaintiff bears the burden of establishing: 1) a fiduciary relationship between the corporation and the alleged wrongdoer; and 2) the existence of a corporate opportunity. Ostrowskiv. Avery, 243 Conn. 355, 362, 703 A.2d 117
(1997); Katz Corp v. T. H. Canty Co., 168 Conn. 201, 207-208,362 A.2d 975 (1975). Once the plaintiff establishes these predicates to liability, the burden then shifts to the fiduciary to establish, by clear and convincing evidence, the fairness of his dealings with the corporation. Ostrowski, supra; KonoverDevelopment Corp. v. Zeller, 228 Conn. 206, 229-30, 635 A.2d 798
(1994); Oakhill Associates v. D'Amato, 228 Conn. 723, 726-27,638 A.2d 31 (1994).
Since Attorney Giulietti admitted that he was both an officer and a director of Vernon Village from 1966 through the time he purchased the Capo properties, the existence of a fiduciary relationship between him and Vernon Village is beyond dispute.
The next predicate to liability is the existence of a corporate opportunity. The dominant inquiry with respect to whether a cause of action for usurpation of a corporate opportunity exists depends on whether the corporate opportunity at issue falls within the corporation's "avowed business purpose." Ostrowski v. Avery, supra, at 367. "The avowed business purpose test. . . . is a variant of the `line of business' test, one of the leading tests of corporate opportunity." Ostrowski,supra, at 366. Under this analysis, the court must consider whether the opportunity is "closely associated with the existing and prospective activities of the corporation." Id. quoting CT Page 16220Rosenblum v. Judson Engineering Corp. 99 N.H. 267, 273,109 A.2d 558 (1954). Factors to be considered are 1) whether the business opportunity was one in which the complaining corporation had an interest or an expectancy growing out of an existing contractual right; 2) whether there was a close relationship between the opportunity and the corporation's business purposes and current activities; and 3) whether the business areas contemplated by the opportunity were readily adaptable to the corporation's existing business. 243 Conn. at 366. The Supreme Court in Ostrowski noted that "[t]he importance of a proper definition of the avowed business purpose test is underscored by the observation of legal scholars that the economic rationale for this test is that, for a small firm in particular, it may well be more efficient to expand its operations than to enter new fields." 243 Conn. at 366, citing V. Brundey C. Clark, "A New Look At Corporate Opportunities," 94 Harvard L. Rev. 998, 1012-13 (1981).
The ability to purchase the Capo properties was clearly a corporate opportunity. It involved not merely a close relationship, but an identical relationship between the opportunity and Vernon Village's business. The corporation owned mobile homes and operated on land adjacent to the Capo land. The corporation's employees, tools and materials located on the site were readily available to service and repair the mobile homes located on the Capo land. Moreover, the utilities which service the Capo mobile homes run through the 325 Kelly Road land on which Vernon Village operates. If Vernon Village had purchased the properties it could have immediately expanded its operations to those properties and could have begun leasing the two mobile homes thereon with minimal time and expense.
In arguing that the potential acquisition of the Capo properties did not constitute a corporate opportunity, Attorney Giulietti relies on two theories. First he claims that Vernon Village operates an age restricted mobile home park, but there are no restrictions on the age of the residents of the Capo mobile homes. This argument fails because the age restriction is a voluntary restriction which has been imposed by Vernon Village. It would be free to impose the restriction on any other land it added to its existing mobile home park. Second, he argues that Vernon Village does not own the land on which it operates its mobile home park, is not in the business of owning land and, therefore, should have no interest in purchasing the Capo property. CT Page 16221
The evidence established that Vernon Village does own land. However, even if Vernon Village did not own land, the opportunity at issue need not present the exact activities in which Vernon Village was engaged in order to constitute a corporate opportunity. It need only be closely associated with the existing and prospective activities of the corporation. Ostrowski, supra, at 366.
The court finds that the defendant, Attorney Giulietti, breached his common law fiduciary duties and his statutory duties to Vernon Village. Vernon Village has elected to claim all the benefits of the transaction for itself and has requested the court to "impress a trust in favor of the corporation upon the property, interests and profits so acquired." See KatzCorporation v. T. H. Canty Co., 168 Conn. 201, 209,362 A.2d 975 (1975) quoting Guth v. Loft, Inc. 23 Del. Ch. 255, 272,5 A.2d 503 (1971). In the Fourth Count Vernon Village seeks to have a constructive trust imposed on the former Capo properties. It also seeks an order requiring John J. Giulietti and John L. Giulietti to transfer the properties to Vernon Village. John J. Giulietti agreed to such a transfer at the time of trial.
The court hereby imposes a constructive trust on the Capo property[7] for the benefit of Vernon Village, Inc. The trust will continue until such time as 1) John J. Giulietti, or his estate, transfers the property to Vernon Village in exchange for $20,700, plus interest at the rate of 10% from the date hereof to be paid by Vernon Village, Inc. to John J. Giulietti, or his estate, and 2) $1,800 plus interest at the rate of 10% per annum from the date hereof to be paid by Vernon Village, Inc. to John L. Giulietti.
Connecticut General Statutes § 33-743 vests this court with the authority to remove John L. Giulietti as a director of Vernon Village, Inc. if the court finds 1) that he engaged in fraudulent or dishonest conduct or gross abuse of authority or discretion, with respect to the corporation and 2) removal is in the best interests of the corporation.
The court finds that Attorney Giulietti engaged in dishonest conduct with respect to the corporation by virtue of his usurpation of the corporate opportunity. The court further finds that it would be in the best interests of Vernon Village, Inc. if Attorney Giulietti is not a director thereof. During the course of the trial of this action, the court heard evidence that CT Page 16222 Attorney Giulietti had refused to sign corporate checks in accordance with his obligations as the self proclaimed "de facto treasurer" of the corporation. This court, L. Sullivan, J., barred Attorney Giulietti from entering upon the corporate premises in April of 1997, but permitted him to retain his check signing authority. The undersigned terminated that authority because Attorney Giulietti attempted to frustrate Vernon Village's litigation against him by refusing to sign corporate checks which he should have signed. He was also disruptive at Board of Directors meetings, and had never been involved in operating Vernon Village. Prior to April of 1997 James Giulietti and his father operated the mobile home park and after that date James Giulietti and his wife did so.
For the reasons set forth above, it is hereby ordered that John L. Giulietti is removed as a director of Vernon Village, Inc.
By the court,
Aurigemma, J.